CHRISTINE MADSEN *vs.* ROBERT ERWIN & others, trustees, & others.[1]

Suffolk. October 4, 1984. — August 21, 1985.

Present: HENNESSEY, C.J., WILKINS, ABRAMS, NOLAN, & O'CONNOR, JJ.

*Practice, Civil,* Summary judgment, Motion to dismiss, Complaint. *Religion. Constitutional Law,* Freedom of religion. *Civil Rights,* Availability of remedy. *Contract,* Employment.

In an action arising out of the plaintiff's termination from her employment as a writer for The Christian Science Monitor newspaper because of her sexual preference and refusal to "[seek] healing" through the Christian Science Church, the judge would not have been warranted, based on an evaluation of affidavits submitted at trial, in finding that a genuine issue of fact existed as to whether the plaintiff was employed by the Church, where the defendants' affidavits gave rise to the reasonable inferences that the plaintiff applied for employment to the Church, that the newspaper was a branch of the Church, and that the plaintiff, although a writer for the newspaper, was, in fact, an employee of the Church, and where the plaintiff's counter affidavits failed to allege facts made on personal knowledge that the plaintiff was not a Church employee. [719-722]

In an action arising out of the plaintiff's termination from her employment as a writer for The Christian Science Monitor newspaper because of her sexual preference and refusal to "[seek] healing" through the Christian Science Church, summary judgment for the defendants should have been allowed, based on the undisputed fact that the plaintiff was employed by the Church, with respect to the plaintiff's claims under the Federal and State Constitutions, as to her claim of civil rights violation under G. L. c. 12, § 11I, and as to her claims for breach of contract and for wrongful discharge, where the defendants' affidavits established "[t]hat

[1] The complaint listed the defendants as follows:
"Trustees (namely Robert Erwin, Frederick Owen, and Beulah Roegge), Christian Science Publishing Society; Board of Directors (namely Hal M. Friesen, Jean Stark Hebenstreit, H. Dickinson Rathbun, Michael B. Thorneloe and Harvey W. Wood), The First Church of Christ, Scientist, in Boston, Massachusetts; J. Anthony Periton; Earl W. Foell; Curtis J. Sitomer; Sandra Newville; Pamela O. Marsh; Warren D. Silvernail; Karen Gould; The First Church of Christ, Scientist, in Boston, Massachusetts; and one unnamed individual."

homosexuality is a deviation from the moral law" as expounded by the Christian Science Church, and that every employee of the Church is expected to uphold the Church's standard of morality, and where the decision to fire the plaintiff because of her sexual preference could only be construed as a religious one, made by the Church as her employer, to which, under the First Amendment to the United States Constitution, courts must defer. [722-726] O'CONNOR, J., concurring.

Although stating that the allegations of the plaintiff's complaint, in an action arising out of the termination of her employment as a writer for the Christian Science Monitor newspaper, a branch of the Christian Science Church, because of her sexual preference, were insufficient to state causes of action with respect to defamation, interference with advantageous relations, interference with the plaintiff's employment contract, invasion of privacy, and intentional infliction of emotional distress, this court directed that the plaintiff be permitted to amend her complaint by repleading her claims for these torts, which the court emphasized involve "freedom to act," rather than "freedom to believe," and are therefore subject to regulation. [726-727] O'CONNOR, J., dissenting.

CIVIL ACTION commenced in the Superior Court Department on December 1, 1982.

A motion to dismiss or, in the alternative, for summary judgment was heard by *George N. Asack*, J., sitting under statutory authority.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Theodore E. Dinsmoor* (*Douglas F. Seaver & Timothy Q. Feeley* with him) for the defendants.

*Katherine Triantafillou* for the plaintiff.

*Robert J. Ebersole*, for Gay & Lesbian Advocates & Defenders, amicus curiae, submitted a brief.

*Marjorie Heins*, for Civil Liberties Union of Massachusetts, amicus curiae, submitted a brief.

*Roberta Achtenberg & Donna J. Hitchens*, of California, & *Abby R. Rubenfeld, Jyl Lynn Felman & Marsha Levick*, of New York, for Lesbian Rights Project & others, amici curiae, submitted a brief.

NOLAN, J. The plaintiff, Christine Madsen, commenced this action for declaratory and injunctive relief and for money damages after her employment as a writer for The Christian Science Monitor (Monitor) was terminated. In sum, her complaint alleges "wrongful discharge, defamation, invasion of

privacy, intentional infliction of mental distress, sexual and affectional preference discrimination, and breach of fiduciary responsibilities under deeds of trust, by defendants against [Madsen,] a lesbian employee of The Christian Science Monitor and a member of the Christian Science Church." It is a broad brush complaint which in its prologue invokes the Massachusetts civil rights statutes, G. L. c. 12, §§ 11H, 11I, G. L. c. 214, § 1B (invasion of privacy), "the common law of the Commonwealth of Massachusetts, the Constitution of the Commonwealth of Massachusetts, and the Constitution of the United States." All defendants except the one unnamed defendant filed a "Motion to Dismiss And/Or For Summary Judgment" under Mass. R. Civ. P. 12 (b) (6), 365 Mass. 754 (1974), and 56, 365 Mass. 824 (1974). The motion was accompanied by a brief and affidavits. A judge of the Superior Court denied this motion, without issuing a written order or memorandum. The defendants subsequently filed a motion to report this interlocutory decision for appellate review under Appeals Court Rule 2:01, as amended, 3 Mass. App. Ct. 805 (1975). A single justice of the Appeals Court, treating this motion as a petition for leave to file and enter an appeal from the denial of the defendants' motion to dismiss or for summary judgment, allowed the petition and stayed proceedings in the Superior Court pending disposition of the appeal. We took the case on our own motion. We reverse the judge's denial of the defendants' motion for summary judgment with respect to the plaintiff's claims against the defendants under the Federal and State Constitutions, under G. L. c. 12, § 11I, her claim for breach of contract and for wrongful discharge. We affirm the judge's action with respect to the remaining claims.

The defendants, in their motion and accompanying memorandum, sought dismissal of the plaintiff's claims under rule 12 (b) (6). Alternatively, they requested that their motion be treated as one for summary judgment, under rule 56, with respect to those claims for which consideration of matters outside of the pleadings, including the affidavits accompanying the motion, became necessary. We consider the defendants' motion as one for summary judgment as to certain counts as

well as for dismissal under rule 12 (b) (6) as to other counts, and review the judge's denial of this motion.

It would be helpful to summarize the facts underlying this appeal. In June, 1974, the plaintiff began employment with the Monitor as a "copygirl." Over the next several years, Madsen received several promotions and salary increases. Beginning in September, 1981, Madsen held a writing position (Correspondent A) in the special sections department of the Monitor.

In December, 1981, Madsen learned that rumors concerning her sexual predilection were being circulated at the Monitor. Subsequently, Madsen was informed that her superiors had learned of allegations that Madsen was a homosexual, had entered into a "homosexual marriage," had attempted to entice a manager's wife into a homosexual relationship, attended meetings of homosexuals, and lived with a homosexual. Madsen was not told the name of the person who provided this information to the editors of the Monitor. In response, Madsen denied the allegations that she had entered into a "homosexual marriage," had attempted to entice a manager's wife into a homosexual relationship, attended meetings of homosexuals and lived with a homosexual. She did state, however, that she was "gay."

On January 4, 1982, the Monitor terminated Madsen's employment. The plaintiff alleges that she has been unable to obtain comparable employment as a writer or editor since she left the Monitor. She further claims that the defendants' actions proximately caused her to suffer extreme mental distress, loss of earning capacity, loss of respect and reputation, and other injuries to body and mind.

The defendants argue on appeal that the judge erred in failing to dismiss the complaint, because (1) pursuit of the litigation and granting the requested relief would violate the free exercise and establishment of religion clauses of the First Amendment to the United States Constitution; (2) the plaintiff's Federal and State constitutional claims are without foundation, because the complaint does not contain adequate allegations of State action; (3) in the plaintiff's claim under G. L. c. 12, § 11I, the complaint does not allege threats, intimidation, coercion, or supporting constitutional or statutory violations; (4) the

plaintiff's claim under G. L. c. 214, § 1B, is faulty because the defendants' inquiries were reasonable as a matter of law; (5) claims against individual defendants are without merit, because the complaint does not contain factual allegations against them; (6) the plaintiff's common law claims are without force, because the defendants' conduct was not unlawful or wrongful and therefore does not provide a basis for liability under any contract or tort theory; (7) the plaintiff's common law claims are illusory, because the complaint fails to state facts upon which relief can be granted.

1. *Motion for summary judgment.* Initially, we note that a judge presented with a motion for summary judgment must consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any" in determining whether summary judgment is appropriate. Mass. R. Civ. P. 56 (c), 365 Mass. 824 (1974). The burden on the moving party is to "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Id.*

Further, "[w]hen a motion for summary judgment is made and supported . . . an adverse party may not rest upon the mere allegations of denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him." Mass. R. Civ. P. 56 (e). See *Community Nat'l Bank* v. *Dawes*, 369 Mass. 550, 554 (1976). Moreover, rule 56 (e) provides that affidavits used to support or oppose a summary judgment motion "shall be made on *personal knowledge*, shall set forth such facts as would be *admissible in evidence*, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Mass. R. Civ. P. 56 (e) (emphasis added). The requirements of rule 56 (e) are mandatory. *Jameson* v. *Jameson*, 176 F.2d 58, 60 (D.C. Cir. 1949). 10A C.A. Wright & A.R. Miller, Federal Practice and Procedure § 2738, at 467 (2d ed 1983).

We turn first to the issue whether the Monitor is a religious activity of the Christian Science Church. The defendants sub-

mitted the affidavits of Warren D. Silvernail, personnel manager of the Church, in support of their motion. The affiant averred that "[t]he Church's personnel office [was] in charge of the personnel functions at the Church and its religious activities including The Christian Science Publishing Society which publishes the Christian Science Monitor"; that a memorandum regarding sexual morality "was distributed on or about August 8, 1974 to all Church employees, including those working for The Christian Science Monitor"; and that an employee badge was "issued to and worn by the plaintiff during her employment by the Church." Accompanying the affidavits were, inter alia, authenticated copies of the plaintiff's application for employment to the "First Church of Christ, Scientist in Boston, Massachusetts"; of portions of the Employee Handbook, providing, in relevant part, that "the policy of The Mother Church [is] to employ only members of the Church in all of its activities, including The Christian Science Publishing Society . . ."; and of the plaintiff's employee badge labelled "The First Church of Christ, Scientist, Boston."

In opposition to the defendants' motion, the plaintiff submitted counter affidavits including that of Susan D. Schur who stated the following: "3. On or about January 27, 1983 I received a solicitation letter from A.W. Phinney, Committee on Publication for Massachusetts, The First Church of Christ, Scientist, in Boston, Massachusetts, in due course of mail at my residence address; . . . 5. It is my understanding that The Christian Science Monitor is not an organ of The First Church of Christ, Scientist, in Boston, Massachusetts, on the basis of said solicitation." The attached solicitation letter contained the statement that the Christian Science Monitor was "not a church organ, . . . but rather an international daily newspaper that touches on all the vital issues of the day."

Evaluating these affidavits in light of the unambiguous guidelines of rule 56 (e), we conclude that the judge below would not have been warranted in finding that a genuine issue of fact existed as to whether the plaintiff was employed by The Christian Science Church. The defendants' affidavits gave rise to the reasonable inferences that the plaintiff applied for

employment to the Church, that the Monitor was an arm of the Church, and that the plaintiff, although a writer for the Monitor, was, in fact, an employee of the Church. The plaintiff wore a badge stating she was a Church employee. The counter affidavits failed to allege facts made on personal knowledge that the plaintiff was not a Church employee. The plaintiff herself did not contradict the fact she was a Church employee in her affidavit.

Hearsay in an affidavit is unacceptable to defeat summary judgment. See, e.g., *Neely* v. *St. Paul Fire & Marine Ins. Co.*, 584 F.2d 341, 344 (9th Cir. 1978); *Kern* v. *Tri-State Ins. Co.*, 386 F.2d 754, 756 (8th Cir. 1967). The rationale for requiring admissible evidence in affidavits is to ensure that "trial would [not be] futile on account of lack of competent evidence." *Kern* v. *Tri-State Ins. Co., supra.* "Conclusory statements, general denials, and factual allegations not based on personal knowledge [are] insufficient to avoid summary judgment." *Olympic Junior, Inc.* v. *David Crystal, Inc.*, 463 F.2d 1141, 1146 (3d Cir. 1972). "All affidavits or portions there of made on information and belief, as opposed to personal knowledge, are to be disregarded in considering a motion for summary judgment." *Shapiro Equip. Corp.* v. *Morris & Son Constr. Corp.*, 369 Mass. 968 (1976), citing *Automatic Radio Mfg. Co.* v. *Hazeltine Research, Inc.*, 339 U.S. 827, 831 (1950).

Clearly, therefore, the judge properly could have excluded the contents of Schur's affidavit in considering the motion. However, the defendants did not move to strike the improper portions of Schur's affidavit. "If a party does not move to strike the defective portion of an opponent's affidavit, in his discretion a judge may rely on the fact stated on belief." *Stetson* v. *Selectmen of Carlisle*, 369 Mass. 755, 763 n.12 (1976). We do not know whether the judge relied upon Schur's affidavit in ruling on the motion, yet we need not decide whether consideration of the affidavit would have constituted an abuse of discretion. Even if the contents of Schur's affidavit were properly before the judge, the material submitted by the plaintiff failed to establish a genuine issue of fact. A vague statement that the Monitor is "not an organ" of the Church was insufficient

to rebut the clear inference created by Silvernail's affidavit that the Monitor is a religious activity of the Church.[2]

The issue before us, therefore, is whether the defendants were entitled to judgment as a matter of law on the basis of the undisputed fact that the plaintiff was employed by the Church. The plaintiff's central allegation is that her employment was terminated because of her sexual preference and refusal to "[seek] healing" through the Church.[3] The defendants' affidavits established "[t]hat homosexuality is a deviation from the moral law" as expounded by Christian Science, and that it is expected that every employee of the Church will uphold the Church's requisite standard of sexual morality.

Courts cannot question the verity of religious doctrines or beliefs. *United States* v. *Ballard*, 322 U.S. 78, 86 (1944). Beyond that, a court must defer to the Church in matters of ecclesiastical decisons. *Serbian E. Orthodox Diocese* v. *Milivojevich*, 426 U.S. 696, 709 (1976). *United Kosher Butchers Ass'n* v. *Associated Synagogues of Greater Boston, Inc.*, 349 Mass. 595, 598-599 (1965). On the affidavits, the decision to fire Madsen because of her sexual preference can only be

---

[2] Our conclusion on the status of the Monitor is, of course, strictly limited to the case before us. It is clear that "[n]ot every enterprise cloaking itself in the name of religion can claim the constitutional protection conferred by that status." *Van Schaick* v. *Church of Scientology of Cal., Inc.*, 535 F. Supp. 1125, 1144 (D. Mass. 1982), quoting *Founding Church of Scientology* v. *United States*, 409 F.2d 1146, 1160 (D.C. Cir.), cert. denied, 396 U.S. 963 (1969). "[N]ot every endeavor that is affiliated, however tenuously, with a recognized religious body may qualify as a religious activity of that body and come within the scope of the protection from governmental involvement that is afforded by the First Amendment." *Feldstein* v. *Christian Science Monitor*, 555 F. Supp. 974, 978 (D. Mass. 1983). The affidavits in this action, however, establish "that the Monitor is itself a religious activity of a religious organization, albeit one with a recognized position and an established reputation in the secular community." *Id.*

[3] Although at oral argument the plaintiff did not concede that the only reason for her termination was that she was a homosexual, the papers before the judge on the motion for summary judgment gave no hint of any other reason. "Pleadings must stand or fall on their own. Oral representations and extraneous materials not incorporated by reference can neither add to nor detract from them." *Mmoe* v. *Commonwealth*, 393 Mass. 617, 620 (1985).

construed as a religious one, made by a Church as employer. Thus, we must defer to that decision. "[C]ivil courts are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law." *Serbian E. Orthodox Diocese, supra* at 713.

In *Walker* v. *First Presbyterian Church*, 22 Fair Empl. Prac. Cas. (BNA) 762, 764 (Cal. Super. Ct. 1980), the plaintiff was discharged as church organist when he admitted his homosexuality and refused to repent. The judge concluded that if the plaintiff "were allowed to collect damages from defendants because he was discharged for being gay, defendants would be penalized for their religious belief that homosexuality is a sin for which one must repent . . . . It forces defendants to pay general and special damages, plus punitive damages, to maintain their religious beliefs. This is a substantial burden on defendants' right to free exercise of religion." *Id.* Similarly, the plaintiff in *Lewis ex rel. Murphy* v. *Buchanan*, 21 Fair Empl. Prac. Cas. (BNA) 696 (Minn. Dist. Ct. 1979), sought damages when an offer of employment as a parochial school teacher was withdrawn after the pastor received information that the plaintiff "was of a homosexual nature." The judge would not enforce an ordinance forbidding employment discrimination on the basis of "affectional or sexual preference" against the pastor. The judge reasoned that "the religious conscience of an individual may not be invaded except where the individual's *conduct* constitutes a 'clear and present danger to a substantial interest of the state' or a 'menace to public peace and order.' [*Cantwell* v. *Connecticut,*] 310 U.S. 296, 311 (1940). The desire of a city government to protect the employability of homosexuals is not such a clear and present danger to a 'substantial interest of the state' as to justify the invasion of an individual's freedom of conscience which is proposed here." *Id.* at 698.

One commentator has described the relationship between a church and its employees as follows: "The free exercise of religion includes the right to run large religious institutions — certainly churches, seminaries, and schools, and . . . hospitals,

orphanages, and other charitable institutions as well. Such institutions can only be run through employees. It follows at the very least that the free exercise of religion includes the right of churches to hire employees. It surely also follows that the churches are entitled to insist on undivided loyalty from these employees. The employee accepts responsibility to carry out part of the religious mission. . . . [C]hurches rely on employees to do the work of the church and to do it in accord with church teaching. When an employee agrees to do the work of the church, he must be held to submit to church authority in much the same way as a member. . . . The state may not intervene to protect employees from treatment that is merely arbitrary or unfair; the remedy for that is to resign or renegotiate the terms of employment. Modern labor legislation may have deprived secular employers of the fiduciary duty once owed them by their rank and file employees, but to deprive the churches of that duty would be to interfere with an interest protected by the free exercise clause." Laycock, Towards a General Theory of the Religion Clauses: The Case of Church Labor Relations and the Right to Church Autonomy, 81 Colum. L. Rev. 1373, 1408-1409 (1981).

In view of the preferred position which the freedom of religion holds in the pantheon of constitutional rights, see *Murdock* v. *Pennsylvania*, 319 U.S. 105, 115 (1943), Madsen's asserted rights must yield. Therefore, her claims against the Church under the Federal and State Constitutions, under G. L. c. 12, § 11I, and her claim for breach of contract must fall. Entanglement of the defendants in such litigation would involve the court in a review of an essentially ecclesiastical procedure whereby the Church reviews its employees' spiritual suitability for continued employment. That is impermissible under the First Amendment. "The First Amendment has a dual aspect. It not only 'forestalls compulsion by law of the acceptance of any creed or the practice of any form of worship' but also 'safeguards the free exercise of the chosen form of religion.'" *United States* v. *Ballard, supra* at 86, quoting *Cantwell* v. *Connecticut*, 310 U.S. at 303. Furthermore, if Madsen "were allowed to collect damages from defendants because [she] was

discharged for being gay, defendants would be penalized for their religious belief that homosexuality is a sin for which one must repent . . . ." *Walker, supra* at 764. Requiring the defendants to pay damages to maintain their religious beliefs would constitute "a substantial burden on defendants' right to free exercise of religion." *Id.*

There is nothing in the very recent case of *Tony & Susan Alamo Found.* v. *Secretary of Labor*, 471 U.S. 290 (1985), which militates against our conclusions in this case because in making the minimum wage, overtime, and recordkeeping requirements of the Fair Labor Standards Act, 52 Stat. 1060, as amended, 29 U.S.C. § 201 et seq., applicable to the commercial activities of a religious foundation like the Tony and Susan Alamo Foundation, the Court did nothing to burden or punish the foundation's exercise of religious beliefs or to exact a penalty for religious beliefs.

The Monitor, as Madsen's employer, had the right to terminate Madsen's employment. Nothing in the United States Constitution, the Massachusetts Constitution, or in Federal or State statutes[4] prohibits the Monitor from doing this on the facts in this case. She had no written employment contract. She received severance and vacation pay. There has been no showing of bad faith as exemplified in *Fortune* v. *National Cash Register Co.*, 373 Mass. 96, 103 (1977), and in *RLM Assocs.* v. *Carter Mfg. Corp.*, 356 Mass. 718 (1969). There is no suggestion that Madsen's discharge deprived her of future compensation for past service as was the case in *Gram* v. *Liberty Mut. Ins.*

---

[4] See *Macauley* v. *Massachusetts Comm'n Against Discrimination*, 379 Mass. 279, 281-282 (1979) (G. L. c. 151B, § 4, [1], which proscribes employment discrimination based on sex, does not include discrimination based upon sexual preference; therefore MCAD does not possess jurisdiction over such complaints); see also *Voyles* v. *Ralph K. Davies Medical Center*, 403 F. Supp. 456, 457 (N.D. Cal. 1975), aff'd, 570 F.2d 354 (9th Cir. 1978) (in enacting Title VII of the Civil Rights Act of 1964, Congress did not consider situations involving trans-sexuals when banning employment practices based upon sex); *Smith* v. *Liberty Mut. Ins. Co.*, 395 F. Supp. 1098, 1101 (N.D. Ga. 1975), aff'd, 569 F.2d 325 (5th Cir. 1978) (Title VII does not forbid discrimination based upon "affectional or sexual preference").

*Co.*, 384 Mass. 659, 671-672 (1981). There is no legal basis then for Madsen's claim for wrongful discharge, breach of contract, and deprivation of constitutional rights by her termination. For the same reasons, Madsen has failed to demonstrate that she was deprived of her civil rights under G. L. c. 12, §§ 11H, 11I, because, as already pointed out, the Monitor had a right to discharge her. Thus, we conclude that the defendants' motion for summary judgment should have been allowed as to these claims.

2. *Motion for dismissal under Mass. R. Civ. P. 12 (b) (6).* Because the affidavits do not relate to the remaining claims, we evaluate those claims under rule 12 (b) (6). The relevant question becomes: Does it appear "beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief?" *Nader* v. *Citron*, 372 Mass. 96, 98 (1977), quoting *Conley* v. *Gibson*, 355 U.S. 41, 45-46 (1957). The remaining claims are those for defamation, interference with advantageous relations, interference with the plaintiff's employment contract, invasion of privacy, and intentional infliction of emotional distress. We analyze the plaintiff's complaint to determine whether she has stated a cause of action against the various defendants with respect to each of these torts. We also consider whether the complaint affords the defendants sufficient notice of the causes of action, as required by Mass. R. Civ. P. 8, 365 Mass. 749 (1974). See *Charbonnier* v. *Amico*, 367 Mass. 146, 152-153 (1975).

The allegations of the complaint do not survive attack by motion to dismiss. However, we think that the plaintiff should be given the opportunity to replead her claims for the above recited torts in the light of the following principles.

Without retreating for a moment from the foundational rule "that the First Amendment prohibits civil courts from intervening in disputes concerning religious doctrine, discipline, faith, or internal organization," *Alberts* v. *Devine, ante* 59, 72 (1985), and cases cited therein, we restate the equally important rule that the rights of religion are not beyond the reach of the civil law. See *Reynolds* v. *United States*, 98 U.S. 145, 164 (1878). Under the banner of the First Amendment provi-

sions on religion, a clergyman may not with impunity defame a person, intentionally inflict serious emotional harm on a parishioner, or commit other torts. The First Amendment religion provisions contain two concepts, "freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society." *Cantwell* v. *Connecticut*, 310 U.S. 296, 303-304 (1940). The torts of which Madsen complains are conduct and hence, they are subject to regulation. We recognize that the defendant may be able to interpose defenses or qualified privileges, but these are generally not raised by motion to dismiss under rule 12 (b) (6).

3. *Summary.* The defendants' motion for summary judgment as to Madsen's claims under the Federal and State Constitutions, as to her claim of civil rights violation under G. L. c. 12, § 11I, and as to her claims for breach of contract and for wrongful discharge should have been allowed, and, accordingly, we direct the entry of judgment for the defendants as to these claims. As to the tort claims of defamation, interference with advantageous relations, interference with her employment contract, invasion of privacy, and infliction of emotional distress, we direct that Madsen be permitted to amend her complaint by pleading anew these torts in a manner consistent with the principles set forth in this opinion.

*So ordered.*

O'CONNOR, J. (concurring in part, dissenting in part.) I concur in the court's decision directing the entry of judgment for the defendants as to the plaintiff's claims under the Federal and State Constitutions, as to her claim for a civil rights violation under G. L. c. 12, § 11I (1984 ed.), and as to her claims for wrongful discharge and breach of contract, but I do not agree with the court's rationale that it must reach that decision because the decision to fire Madsen "can only be construed as a religious one" to which, under the First Amendment, the court must defer. See *ante* at 722-723. I dissent from that part of the

court's decision which directs that the plaintiff be permitted to amend her complaint by repleading her tort claims.

The court has repeatedly said that it will not decide constitutional questions "unless they must necessarily be reached." *Commonwealth* v. *Paasche*, 391 Mass. 18, 21 (1984). "[I]f a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter." *Commonwealth* v. *Bartlett*, 374 Mass. 744, 749 (1978), quoting *Ashwander* v. *TVA*, 297 U.S. 288, 347-348 (1936) (Brandeis, J., concurring). This case is a perfect example of the wisdom of that rule. Entirely apart from First Amendment considerations, the complaint fails to state against any defendant a claim for which relief may be granted. A careful analysis of the complaint — an analysis missing from the court's opinion — makes that clear. Furthermore, in my view, both the court's analysis of the constitutional question that it unnecessarily reaches and the court's conclusion are highly questionable.

I set forth the facts as alleged in Madsen's complaint. On or about December 12, 1981, the defendant Earl W. Foell, editor of the Monitor, discussed with the defendant Pamela O. Marsh, quality control editor of the Monitor and Madsen's immediate superior, a rumor that Madsen had either asked a manager's wife to attend a lesbian meeting or had enticed a manager's wife into a lesbian relationship. Foell and Marsh decided to discuss the rumor with J. Anthony Periton, manager of the Christian Science Publishing Society, publisher of the Monitor. On or about December 14, 1981, Marsh told Madsen about the manager's wife rumor and asked Madsen if she was a lesbian. Madsen denied the rumor but told Marsh that she was a lesbian. Marsh said that she had thought so, and that she would have to make a report to Foell, who had been asked by Periton to check out the situation.

On or about December 15, 1981, Marsh and Madsen again discussed the rumors. Marsh told Madsen that a certain newsroom editor had telephoned Marsh to say that he was upset that Madsen had changed her name from Terp to Madsen be-

cause of a homosexual marriage. Marsh said that Foell had also called her to find out whether Madsen had changed her name because of a homosexual marriage. Marsh told Madsen that she had told both the newsroom editor and Foell that Madsen had simply changed her name to a family name she preferred.

On or about December 16, 1981, Foell, Periton, and Marsh met and discussed the manager's wife rumor. Periton asked the other two if Madsen was a lesbian, if she went to "gay" meetings, and if she lived with a lover. Marsh told Periton that Madsen lived alone. Periton said that he would have to find out if Madsen went to "gay" meetings because that would indicate whether Madsen was a lesbian.

On December 18, 1981, Madsen met with Periton and complained about what had been taking place. Periton told her that they were following appropriate procedures because someone had made an accusation to Periton privately. Periton said to Madsen that Madsen had tried to entice a manager's wife into a lesbian relationship, that Madsen attended "gay" meetings, and that Madsen was "gay." Madsen responded that she would not discuss the matter without adherence to Church by-laws. Periton demanded to know if the information he had was accurate, and Madsen reluctantly replied by denying the manager's wife rumor and admitting she was "gay." Periton thanked Madsen for her honesty and said that it was Church policy to "let the employee go in cases like this."

On December 23, 1981, Periton gave Madsen a pamphlet entitled "Morals of Today," and asked Madsen to "heal herself" of homosexuality. Periton told Madsen that he would have to discuss with Warren D. Silvernail, personnel manager of the Church, Madsen's refusal to heal herself. On or about December 29, 1981, Madsen met with Karen Gould, the employee relations manager of the Church who was responsible for "employee problems" within the Church and the Society. Gould repeated to Madsen the accusations about the manager's wife, attendance at "gay" meetings, and Madsen being a lesbian, and she told Madsen that the problem was not the rumors, but rather that Madsen was "gay." Gould asked Madsen if she was

seeking healing and Madsen replied that she was not. Gould told her that she had until December 31, 1981, to resign, that, if she did not resign by then, she would be fired, and that, either way, her departure would be described as a "mutual termination, citing religious differences."

On or about December 30, 1981, the defendant Curtis J. Sitomer, editor of the special sections department of the Monitor, Madsen's department, told Madsen that he would talk with Gould in an effort to arrange a leave of absence for Madsen. On or about January 4, 1982, Gould told Madsen that a leave of absence would be possible only if Madsen were seeking healing. When Madsen told Gould that she was not seeking healing, Gould told Madsen that that would be her last day and told her what her severance and vacation pay would be. Gould put a memorandum into Madsen's employ-ment file stating that Madsen was "not recommended for rehire unless [a] radical change in views on homosexuality takes place."

Other than claims of damages resulting from the events recited above, the complaint sets forth no other material alle-gations. Briefly but fairly summarized, the complaint alleges that rumors about Madsen's homosexuality and homosexual activities came to the attention of the defendant Periton, who was the manager of the Monitor's publisher, and to the defend-ants Foell and Marsh, who were editors of the Monitor, and that those defendants discussed those rumors with each other, with Madsen, and with the defendant Gould, who was em-ployee relations manager of the Church, with the result that Madsen was fired from her position as a writer at the Monitor[1] because of her refusal to seek "healing" of her homosexuality.

After its statement of facts, the complaint sets out numerous claims of injury resulting from constitutional, statutory, and

---

[1] Nothing in the complaint suggests that Madsen wrote about religious or moral topics. On the contrary, her complaint alleges: "On or about June 3, 1982, the plaintiff received notification that she had been awarded first place honors in the Best Sportswriter category of the New England Woman's Press Association . . . for a four-part series entitled 'Women In Sports,' which appeared in the Monitor in May, 1981."

contract violations, and from various torts. Each and every one of those claims expressly relies on the defendants' "aforementioned conduct." A typical claim is: "The defendants' aforementioned conduct constituted an unlawful invasion of plaintiff's privacy in violation of M.G.L. Chapter 214, § 1B, and Constitutions of the Commonwealth of Massachusetts and the United States."

A complaint need not set forth facts with great specificity. See Mass. R. Civ. P. 8 (a), 365 Mass. 749 (1974). As we observed in *Spence* v. *Boston Edison Co.*, 390 Mass. 604, 615 (1983), "[t]he rules of pleading in Massachusetts are generous." However, if, as in this case, the complaint sets out a detailed statement of facts as *the* facts on which the plaintiff relies, and *those* facts do not support any claim entitling the plaintiff to relief, it is appropriate to allow a motion to dismiss or a motion for summary judgment (because there can be no genuine issue of material fact if the complaint fails to state a claim for which relief can be granted). *Id. Fabrizio* v. *Quincy*, 9 Mass. App. Ct. 733, 734 (1980). 5 C.A. Wright & A.R. Miller, Federal Practice and Procedure § 1357 (1969). Such is the case here.

Madsen alleges that she was fired "on the basis of [her] sexual and affectional preferences." That discharge, she claims, constituted "an unlawful breach of [her] employment agreement with the defendants, . . . without cause or justification . . . [and] in bad faith." Furthermore, she claims that the discharge constituted "an unlawful and wrongful termination of [her] employment agreement with the defendants . . . contrary to the public policy of . . . the Commonwealth of Massachusetts," and that her Federal and State constitutional rights and civil rights were violated. The court rightly states, *ante* at 725, that, because Madsen was an employee at will, the Monitor lawfully fired her, because nothing in the Federal or State Constitutions, in Federal or State statutes, or in public policy,[2] prohibits an employer from firing an at will employee

---

[2] In G. L. c. 151B, § 4 (1984 ed.), the Legislature has set out the Commonwealth's public policy regarding employment discrimination. That stat-

on the facts of this case. Therefore, the court rightly concludes, *ante* at 726, that there is no legal basis for Madsen's claims of wrongful discharge, breach of contract, deprivation of constitutional rights, or deprivation of civil rights under G. L. c. 12, § 11I.

The correctness of those conclusions, however, does not in any way depend on the First Amendment. Those conclusions would be correct if the controversy were entirely unrelated to a church or to church personnel. For that reason alone, the court's discussion of the First Amendment is inappropriate. The court's analysis may be incorrect as well. It is true, as the court says, *ante* at 722-723, that the First Amendment prohibits civil courts from intervening in disputes concerning religious doctrine, discipline, faith, or internal organization, *Jones* v. *Wolf*, 443 U.S. 595, 602 (1979); *Serbian E. Orthodox Diocese* v. *Milivojevich*, 426 U.S. 696, 709 (1976); *Alberts* v. *Devine*, *ante* 59, 72 (1985), and that courts cannot question the verity of religious doctrines or beliefs. *United States* v. *Ballard*, 322 U.S. 78, 86 (1944). Thus, Madsen cannot invoke the jurisdiction of the courts of the Commonwealth to determine the morality of homosexuality or to determine whether membership in the Church requires adherence to the view that homosexuality is immoral. However, whether Madsen, a writer (presumably a sportswriter, see note 1, *supra*) for a church-affiliated newspaper, is entitled to continued employment despite her nonconformity to the Church's beliefs, does not appear to be a dispute about religious doctrine, discipline, faith, or internal organization, within the decided cases. Although the United States Supreme Court has held that the assessment of an individual's qualifications to be a minister, and the appointment and retirement of ministers, are ecclesiastical matters entitled to constitutional protection against judicial or other State interference, *Kedroff* v. *St. Nicholas Cathedral of*

ute provides: "It shall be an unlawful practice . . . [f]or an employer . . ., because of the race, color, religious creed, national origin, sex or ancestry of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual . . . ." The statute does not preclude employment discrimination based on sexual preference.

*the Russian Orthodox Church*, 344 U.S. 94, 116 (1952); *Gonzalez* v. *Roman Catholic Archbishop of Manila*, 280 U.S. 1, 16-17 (1929), the Supreme Court has never held that civil courts cannot intervene in similar matters involving lay church employees. While the beliefs and practices of a minister are of critical importance to the church in which the minister functions, making judicial involvement in decisions affecting a minister's tenure inappropriate, it is far from clear that the same is true with respect to a sportswriter on the staff of a church-affiliated newspaper. Compare *McClure* v. *Salvation Army*, 460 F.2d 553, 558-561 (5th Cir. 1972) (First Amendment *precludes* application of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. [1976] to employment relationship between a church and its *minister*), with *E.E.O.C.* v. *Southwestern Baptist Theological Seminary*, 651 F.2d 277, 281-287 (5th Cir. 1981) (First Amendment does *not* preclude application of Title VII to employment relationship between church and its *non-ministerial employees*).

I incline to the view that, if it were appropriate for us to reach the First Amendment question, we should not conclude, as the court has done, that "the decision to fire Madsen because of her sexual preference can only be construed as a religious one" and that, therefore, the court "must defer to that decision." *Ante* at 722-723. Rather, I tend to think that the First Amendment would not preclude judicial intervention in this matter and that whether the First Amendment would protect the employer in this case requires a judicial balancing of the competing Church and State interests.[3] "A law, legislatively or judicially created, that would regulate or prevent religiously motivated conduct does not violate the First Amendment if the State's interest in the law's enforcement outweighs the burden that the law im-

---

[3] After concluding that the First Amendment prohibits the court from becoming involved in the controversy about whether the Monitor could lawfully fire Madsen, the court inconsistently relies on *Walker* v. *First Presbyterian Church*, 22 Fair. Empl. Prac. Cas. (BNA) 762, 764 (Cal. Super. Ct. 1980), and *Lewis ex rel. Murphy* v. *Buchanan*, 21 Fair Empl. Prac. Cas. (BNA) 696 (Minn. Dist. Ct. 1979), cases in which the tribunals entertained similar questions, and applied the balancing test.

poses on the free exercise of religion." *Alberts* v. *Devine, supra* at 73. See *Wisconsin* v. *Yoder*, 406 U.S. 205, 215-219 (1972); *Prince* v. *Massachusetts*, 321 U.S. 158, 164-170 (1944). *Cantwell* v. *Connecticut*, 310 U.S. 296, 307 (1940). Heeding my own advice that the court should not reach the constitutional question, I refrain from taking a firm position on what our approach to the constitutional question ought to be. I also refrain from considering whether, if we were to choose the balancing of interests approach, the State's interest in the enforcement of its citizens' contracts is sufficiently compelling to justify the burden, if any, that would be imposed on the defendants' free exercise of religion were we to enforce Madsen's alleged contract rights. I only point out that the First Amendment question is far from simple, that the court confronts it unnecessarily, and that the court answers it, perhaps, incorrectly.

I turn now to Madsen's common law tort claim and to her claim for invasion of privacy in violation of G. L. c. 214, § 1B (1984 ed.). The court concludes, without discussing its reasoning, that those allegations "do not survive attack by motion to dismiss." *Ante* at 726. Apparently, the court does not conclude that the religion clauses of the First Amendment preclude judicial resolution of the tort claims, as distinguished from other claims, but the court does not explain why the First Amendment precludes the courts from imposing damages on the defendants for the wrongful termination of her contract but not for wrongful tortious conduct. In any event, I agree, without reliance on the First Amendment, that Madsen has not stated any valid tort claims.

There was no defamation. The only defendants alleged to have made statements were Foell, Marsh, Periton, and Gould, all of whom, by virtue of their positions, were conditionally privileged to discuss among themselves and with their superiors the allegations regarding Madsen's sexual preference. *Bratt* v. *International Business Machs. Corp.*, 392 Mass. 508, 513 (1984). See Restatement (Second) of Torts §§ 594 and 595 (1977). Nothing in Madsen's complaint even suggests that any of the defendants abused their conditional privilege by speaking

with "malice in fact," *Doane* v. *Grew,* 220 Mass. 171, 176 (1915), nor "by an unnecessary, unreasonable or excessive publication of the defamatory matter." *Galvin* v. *New York, N.H. & H. R.R.,* 341 Mass. 293, 297 (1960). Statements made privately to Madsen are not actionable.

Neither was there any intentional infliction of emotional distress. Madsen alleges that the conduct of the defendants that she described in her complaint constituted "an unlawful, intentional, extreme and outrageous and/or reckless infliction of emotional distress." The described conduct falls far short of being "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Richey* v. *American Auto. Ass'n,* 380 Mass. 835, 838 (1980), quoting Restatement (Second) of Torts § 46 comment d (1965). See *Agis* v. *Howard Johnson Co.,* 371 Mass. 140, 144-145 (1976).

The defendants Silvernail and Gould did not, as alleged, tortiously interfere with Madsen's contract or with her "advantageous business relationship" with the Monitor. The complaint contains no allegations concerning Silvernail's conduct, and all of Gould's alleged conduct was clearly within the scope of her employment responsibilities. Nothing in the statement of facts in the complaint suggests that Gould "acted out of malevolence, that is, with 'actual' malice." *Gram* v. *Liberty Mut. Ins. Co.,* 384 Mass. 659, 663 (1981).

Madsen alleges that the conduct she sets out in her complaint constituted an unlawful invasion of her privacy in violation of G. L. c. 214, § 1B (1984 ed.). It did not. That statute provides, in relevant part, that "[a] person shall have a right against unreasonable, substantial or serious interference with his privacy." Madsen appears to base her privacy claim on the defendants' questioning her about her sexual preference and about other allegations made against her regarding her sexual preference. Because the defendants could lawfully have discharged Madsen on the basis of her sexual preference, when allegations surfaced about Madsen's sexual preference the defendants had a right to question her about it. *Bratt* v. *International Business*

*Machs. Corp.*, 392 Mass. 508, 520 (1984). See *Cort* v. *Bristol-Myers Co.*, 385 Mass. 303, 307 (1982); *Galvin* v. *New York, N.H. & H. R.R.*, 341 Mass. 293, 294-298 (1960). Madsen's complaint clearly does not set forth questioning that involves an "unreasonable, substantial or serious interference with [her] privacy." G. L. c. 214, § 1B (1984 ed.). In her *brief,* Madsen asserts that the defendants also invaded her privacy by "[making] *public* certain information about her *personal life* which intruded upon her *solitude,* involved a *private matter* and put the plaintiff in a *false light*" (emphasis in original). The facts set forth in Madsen's complaint, however, do not support that statement. Nothing in the complaint suggests that the defendants discussed Madsen with anyone other than those entitled to discuss her. Compare *Alberts* v. *Devine, supra* at 62.

Because the plaintiff expressly stated in her complaint that all of the facts on which she relies are therein set forth, and because those facts do not constitute a legal wrong entitling the plaintiff to any form of relief, I would reverse in its entirety the order of the judge denying the defendants' motion to dismiss or for summary judgment, and I would remand the case to the Superior Court with instructions to enter an order dismissing the complaint. The interests of justice are not served by permitting Madsen to amend her complaint by pleading the tort claims anew as the court directs. Nothing in the complaint suggests that there may be facts, in addition to those alleged, which would support the plaintiff's claims.